Amy L Martz  #16508
MARTZ LAW
1682 West Reunion Ave, 4A
South Jordan, UT 84095
AmyLMartz@Protonmail.com
(801) 231-0286

Tyler Ayres, #9200
AYRES LAW FIRM
136 West 12300 South, 201
Draper UT 84020
Tyler@ayreslawfirm.com
(801) 255-5555 Office
(801) 918-9506 cell

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| **REGAN AND BRANDON WILKES for and on behalf of minor child, HW,** Plaintiffs<br><br>**v.**<br>**CANYONS SCHOOL DISTRICT & CANYONS BOARD OF EDUCATION** Defendants | **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF and DAMAGES**<br><br>Case No.<br><br>Judge: |

## INTRODUCTION

1. Regan and Brandon Wilkes ("Parents") for and on behalf of minor child, H.W.

   ("Student"), collectively known as Plaintiffs ("Plaintiffs") bring this action against

   Canyons School District ("District") and Canyons Board of Education, collectively

   known as ("Defendants") for violations of federal and state law regarding discrimination

   against minor child, H.W., a student with disabilities.

2. Defendants violated Student's civil rights under **§1983**, failed to provide Student with a Free Appropriate Public Education (FAPE) under the Individuals with Disabilities Education Act (**IDEA**), discriminated under Section 504 of the Rehabilitation Act of 1973 (**504**), subjected him to discrimination in violation of the Americans with Disabilities Act (**ADA**) and violated his state constitutional rights under the Utah State Constitution (**UTSC**).

3. Plaintiffs seek declaratory, injunctive relief, damages, and attorneys' fees.


**<u>JURISDICTION AND VENUE</u>**

4. This Court has jurisdiction over this complaint pursuant to the Civil Rights Act of 1871 ("**§1983**") 42 USC §1983 and §1988. (cause of action for every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…": attorney's fees and costs.

5. This Court has jurisdiction over this complaint pursuant to the Individuals with Disabilities Education Act ("**IDEA**") 20 USC §1400 (protections for student with disabilities).

6. This Court has jurisdiction over this complaint pursuant to Title V Section 504 of the Rehabilitation Act of 1973 ("**504**") 29 USC §794 (non-discrimination under federal grants and programs).

7. This Court has jurisdiction over this complaint pursuant to Title II of the Americans with Disabilities Education Act ("**ADA**") 42 USC § 12131-12134 (remedies, procedures, and rights of any person alleging discrimination on the basis of disability).

8. This Court has jurisdiction over this complaint pursuant to the Utah State Constitution ("**UTSC**"):

   1. Article I, Section 1: Inherent and Inalienable Rights (ensures all persons have the inherent and inalienable right to enjoy and defend their lives and liberties…and petition for redress of grievances).

   2. Article I, Section 7: Due Process of Law (ensures that no person shall be deprived of life, liberty, or property without due process of law).

   3. Article X, Section 1: (guarantees a free and equal public education to the children of Utah.)

   4. This court should apply state law to the state constitutional claims, as the guarantees of life, liberty, redress, and due process issues from the Utah State Constitution, independent and in addition to the federal guarantees in the United States Constitution.  *State v. Tiedemann*, 2007 UT 49, 183, 162 P.3d 1106; *Batley v. Bayles*, 2002 UT 58, T11 n.2, 52 P.3d 1158.

9. This court has subject matter jurisdiction over this complaint pursuant to 28 USC §1331 (federal question jurisdiction).

10. This court has supplemental jurisdiction over the state claims in this complaint pursuant to *United Mine Workers v. Gibbs*, 383 US 715 (1966).

11. This court may grant the relief sought pursuant to Civil Rights Act of 1871 ("**§1983**") 42 USC §1983 and §1988, compensatory damages, (lost wages, medical expenses,

emotional distress) punitive damages, injunctive relief. *Harvard Law Review*, Volume 134, Issue 4, February 2021.

12. This court may grant relief sought pursuant to allegations of violations of **504**, 29 U.S.C. § 794 (non-discrimination under federal grants and programs). Reasonable attorney fees (29 USC §794(b). Violating these provisions of the code entitle Plaintiff Student to compensatory, punitive damages, remedies incorporated into 504 from the Civil Rights Act of 1964 by 20 USC §794(a).

13. This court may grant the relief sought pursuant to Americans with Disabilities Education Act (**ADA**), 42 USC 12132 (remedies, procedures, and rights for (ADA) shall be the remedies, procedures, and rights under 504). Plaintiff is entitled to general, special, punitive, intentional and negligent infliction of emotional distress damages, and reasonable attorney fees for these upon proper proof and conclusion by the finder of fact.

14. "Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood*, 327 U.S. 678, 684(1946).

15. This court may grant the relief sought pursuant to the Utah State Constitution ("**UTSC**") Article I, Section 1, Article I Section 7, Article X, Section 1.  Plaintiff petitions for redress of grievances and is entitled by Article 1 Section 1 to be heard. The Utah Supreme Court finds the Due Process Clause of the Utah Constitution, Article I, Section 7 is self-executing.  *Spackman v. Bd. of Educ.,* 2000 UT 87, 16 P.3d 533, 534.  (A self-executing constitutional clause is one that can be judicially enforced without implementing legislation.  *Id*.)

1. In the Spackman case, the Utah Supreme Court applied common law to the state constitution claims to justify the right of "individuals to access remedies of money damages for violations of their individual rights." *Id*. at 538.

2. Additionally, if the Court determines, an appropriate remedy could also be fashioned by the court, even if no specific remedy is mentioned. *Id*.

3. The Court determined plaintiffs are entitled to monetary damages for a violation of the Utah State Constitution if defendants 1) commits a flagrant violation of plaintiff's constitutional rights, 2) existing remedies do not redress his injuries, and 3) equitable relief was and is inadequate to protect plaintiff's rights or redress his injuries. *Id*. at 538-539.

16. This court may grant the relief sought pursuant to Rule 57 of the Federal Rules of Civil Procedure (declaratory judgment).

17. Venue in this judicial district is proper under 28 USC §1391 as Defendant has substantial ties and operates in this judicial district in which a substantial part of the events and/or omissions at issue occurred.

## **PARTIES**

18. Plaintiffs, Regan and Brandon Wilkes and minor child, H.W., reside in Salt Lake County, Utah. Student is a 7th grader with Autism who attended Indian Hills Middle School in Canyons School District.

19. Student was identified as having a disability at the age of three.

20. In Kindergarten, 2017, student was determined eligible for an IEP.

21. Student is creative and funny, but he struggles with emotional regulation and executive functioning as a result of his Autism Spectrum Disorder. He currently qualifies for an

Individualized Education Program (IEP) plan under the Individuals with Disabilities Education Act (IDEA) as a person with a disability in need of specialized instruction in social/emotional learning, communication, mathematics, and writing.

22. Defendant is a public school district in Utah, governed by the Canyons School District Board of Education and responsible for the education of students, including students with disabilities.

## FACTUAL ALLEGATIONS

23. Canyons School District "repeatedly failed" to implement programs available to help Student and Plaintiffs in direct violation of federal and state laws requiring accommodations and support from institutions who receive federal funding to educate students.

24. Canyons School District receives and distributes federal funding to Indian Hills Middle School for the benefit of all students, including Student.

25. For all parts relevant to this action, Student has only attended Canyon School District schools.

26. Despite the best efforts of Plaintiff regarding Students education and receival of FAPE, Canyon School District (Defendant) repeatedly failed to implement necessary programs or provide FAPE.

27. Their refusal or failure to do their job resulted in unnecessary stress, confusion, frustration, and pain for Plaintiffs especially Student.

28. Defendants violated Civil Rights Act of 1871 ("CRA 1983") 42 U.S.C. 1983 by failing and refusing to provide student with the educational and public service accommodations

and modifications mandated by the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution.

29. Defendant did not provide academic or behavioral support necessary to provide FAPE.

30. Student is currently a 7th grader at Indian Hills Middle School in Sandy, Utah.

31. Student grew up in Sandy Utah, as an only child.

32. Student is a happy and vibrant child. He engages socially by spending time with friends

and enjoys being included in group activities.

33. Student is bright and curious and, exhibited early signs of emotional dysregulation

leading him to hitting his head and running into walls when upset.

34. When this happens, it eliminates his ability to learn and to fit in with other children both

in the classroom and other informal settings.

35. In addition to acting out, Student loses focus and is distracted by loud noises or

tumultuous surroundings.

36. Losing his focus impacts his ability to learn and succeed within a classroom setting.

37. Plaintiffs recognized these challenges within Student at an early age.

38. Plaintiffs made every attempt to prepare Student for success in school well before it was

time for him to begin attending.

39. Plaintiff observed conduct indicating Student may be in need of accommodations to meet

basic educational needs.

40. At the age of three, Plaintiff sought and received an evaluation for Student.

41. The evaluation indicated Student was Autistic.

42. Plaintiffs researched and studied what being Autistic would mean in relation to Students

potential education and ability to succeed.

43. At every juncture, Plaintiffs exhausted all their resources to provide the greatest opportunity for educational success also known as FAPE, for Student.

44. Plaintiffs greatest fear for Student was the possibility of his wasted potential.

45. Plaintiffs recognized the value in addressing challenges and conditions at the earliest possible time.

46. Plaintiffs also recognized the potential for grave harm if Student was not provided an opportunity to succeed and the cumulative impact of falling behind as well as the degradation of his self-esteem from repeated failure.

47. In June of 2017, when Student was in kindergarten, within Canyon School District, Plaintiffs sought an evaluation for Student to determine if and what additional supports were necessary, as an Autistic child, to enable him to succeed in school.

48. On June 27, 2017, the school recognized Student's learning challenges, the corresponding diagnosis of Autism / neuro-diversity, and signed his IEP under the classification of "Autism for social and emotional dysregulation," leading him to hitting his head and running into walls when upset, by signing the document setting out the parameters of the IEP.

49. Plaintiffs are and were actively involved in establishing an education plan with the district.

50. Although the school signed the student's first IEP under the classification of Autism for social/emotional support…. Defendant declined to create a behavior support plan (BSP) stating "Classroom interventions will be tried first. If further need is necessary, a plan will be implemented."

51. Defendants refused or failed to do their job in relation to Students IEP plan and or necessary accommodations.

52. **Kindergarten** and **1st Grade** data show early academic success. Student knew letters and sounds, read fluently, and was above level in mathematics. His behavior was appropriate. Goals focused on speech and language improvement.

53. During **2nd Grade**, permission to test for Cognitive/Intellectual, Social/Behavioral and Communication skills was obtained in March of 2020 (**3/10/20**). However, COVID-19 disrupted his 3-year re-evaluation, which District failed or refused to complete for another ten months and therefore failed or refused to do their job.

54. In an Eligibility/IEP Meeting on **5/06/20,** District produced an evaluation report with only updated therapy notes and listening comprehension subtest of "NLM." This is another failure or refusal to do their job adequately.

55. A new IEP was developed based on old evaluation data. District stated: "A thorough evaluation will be conducted within 30 days of school resuming." In this instance, Defendants failed or refused to do their job by "deferring" their obligation to Plaintiffs.

56. By **3rd Grade**, math computation declined, and several Term 3 math skills were not yet mastered because Defendants failed or refused to meet their responsibility to Plaintiffs.

57. On **10/26/20,** District produced a Prior Written Notice (PWN) and Consent to Evaluate (not within 30 days of school resuming).

58. A sticky note appears on the signature page that reads as follows, "Backdate to 10/26/2020" implying that the date may have been even later.

59. By **4th Grade**, Student's end of year academic results put District on notice additional assessment was necessary: below basic, non-proficient scores in reading comprehension and failure to master any science and very few language arts concepts.

60. This is a direct and proximate cause of Defendants failure or refusal to comply with their obligations and duties under the law.

61. Principal (N S-M) stated in her testimony from the Due Process hearing, there was discussion at Student's 4th Grade IEP about releasing him from services, but the decision was made to continue to address his pragmatic language deficits (12-19-24 Tr. 333:5-11).

62. Defendant pre-prepared all the Special Education and 504 forms needed to exit Student from Special Education. (12-13-23 Tr. 128:19-129:1) (12-13-23 Tr. 302: 4-8).

63. Principal (N S-M) confirmed the documents were prepared in advance and no changes to documents were made during the meeting. (12-19-2023 Tr. 350:21-351:1).

64. A single meeting note from 5/12/23 minimally documents both the IEP disqualification and the creation of the 504.

65. The decision to exit Student from Special Education was predetermined.

66. A **1/7/21** 4th Grade IEP indicated no behavioral intervention was needed, even though they included a goal for responding appropriately to emotional and social situations.

67. In **5th Grade**, social behavioral concerns led to goals for using appropriate language in social situations, with a baseline of 0%.

68. Reading testing from **8/18/22** and **11/21/22** determined his Reading Lexile was "not proficient."

69. A **5/22/2023** End of Year Report Card states Student had "not yet mastered" 10 of 14 LA skills.

70. Student was falling further behind with each failure and or refusal by Defendant to follow the law and provide additional support for FAPE.

71. Student's IEP annual review was due **1/6/2023** (5th Grade), but District failed or refused to hold an IEP meeting, again, failing or refusing to do their job as required under the law.

72. Months later, District requested permission to test on **4/20/23** when **a** Notice of Meeting for "annual review of IEP" and to "review and discuss evaluation information" was sent to Parents.

73. No Special Education teacher was invited to the meeting, even though Student's classification was Autism. Failure or refusal to do their job.

74. In Students situation, 5th grade is his final year of attending elementary school.

75. Plaintiffs anticipated Student would be progressing from elementary school to middle school in the 6th grade.

76. Plaintiffs believed and communicated their observation of continued need for and IEP going into middle school.

77. Two Notice of Meeting documents for the same meeting reflect a pretermination by District to remove Student from his IEP at the end of 5th grade in **May of 2023** (DP Exh. P61), as the purpose of the meeting changed from considering IEP goals and services to merely determining eligibility.

78. An IEP meeting was held **5/12/23** (5th Grade). District conducted only two new assessments, relied upon six much older assessments, and failed or refused to test academic or sensory needs.

79. The General Education teacher (who performed generalized assessments and found Student's reading fluency below level and comprehension well-below benchmark) did not attend.

80. No Special Education teacher was invited or attended.

81. Student was found **in**eligible for Special Education due to passing off his single Speech goal, which was really a social/emotional goal, better addressed by a social worker or school psychologist.

82. Student was declared to be ineligible for an IEP by an incomplete IEP Team lacking Special and General Education teachers.

83. Protocol, the law, and common sense, mandate the presence of a Special Education teacher and a General Education teacher to attend the meeting and provide input regarding Students performance and their regular observations.

84. Parents opposed the change from an IEP onto a 504 for several reasons:

    1. An IEP provides specialized instruction in student's areas of need, while a 504 does not.

    2. If the District does not follow an IEP, the Utah State Board of Education has four distinct dispute resolution systems for addressing parents' concerns with an (allegedly) impartial, independently contracted "expert" in Special Education: Facilitation, Mediation, State Complaint, and Due Process.

    3. If the District does not follow a 504, parents may request a hearing, but the District selects the hearing officer, there are no rules or guidelines for the hearing, and there are no standards for what is required in a child's 504 plan.

4. An IEP requires parent participation, while a 504 can (unwisely) be created without parent meeting or input.

5. An IEP requires a 3-year re-evaluation, while a 504 does not.

85. Minutes later, a 504 plan was created without the input from a General Education teacher, by elementary personnel with no regard for middle school services or programs.

86. As the Student transitioned out of elementary school, and into middle school, the quality of support began to deteriorate.

87. Despite Parents' repeated efforts to advocate for their child, they were met with increasing resistance, bureaucracy, and inadequate responses from the school system as the continually failed or refused to do their job.

88. School Psychologist (AC) confirmed that parents commonly have concerns about 5th Graders transitioning to middle school. (12-16-24 Tr. 115:1-3). "Middle school is a different setting, so we can't anticipate needs that will arise at the middle school." (12-16-24 Tr. 115:4-14).

89. Student's transition to **6th grade** in middle school, without an IEP, proved disastrous.

90. Student experienced difficulty regulating, focusing, and completing work in the classroom, resulting in failing grades and nightly crises at home.

91. Student is well aware of his struggles and lack of success in school.

92. Student desperately wants to succeed in both his academic and social experiences in school.

93. Student is cognizant and accepts the additional challenges associated with being Autistic.

94. Student sought opportunities to meet with school counselors and psychologists for emotional regulation, both before, during and after school as document in SEL notes from wellness staff.

95. This systemic decision resulted in student immediately experiencing difficulty transitioning to and functioning within the more complex secondary school environment.

96. By Fall of 2023, Student began to exhibit signs of school failure.

97. Parents consistently expressed concerns by email and in person.

98. Parents historically worked constructively with teachers and administrators to foster a positive learning environment.

99. In her testimony at the Due Process hearing, Assistant Principal (KA) recalled, "the tone from mom was always polite and grateful" (DP TR. 67:10-11). This testimony speaks to Parent's (RW) normally cooperative nature.

100.    Multiple modifications to Student's 504 plan were made, with increasing Parent and Student frustration as accommodations were not implemented (DP Exh. 46) "These services are dependent on school resources and available personnel," was written on his 504 plan, indicating school was NOT COMMITTED to providing the accommodation and was using lack of funding as an excuse.

101.    A 504 Meeting to amend Student's plan was held on **10/09/2023** (6th Grade).

102.    Parent created a daily assignment tracker.  It was written into the 504 that teachers would fill out Student's planner at the end of each class.

103.    Teachers used it only briefly, and some refused to use the tracker all together, saying, "I'm not doing that."

104.    These teachers failed or refused to do their job and provide FAPE for Student.

105.     A second 504 meeting was held on **10/16/23** (6th Grade) to amend the 504 plan at Parents' request.

106.     Parents invited Kat Nelson, District Teacher Specialist, to attend the meeting, in an attempt to encourage the school to comply with the 504 plan thereby doing their job.

107.     End of 1st Quarter Grades came out on **10/27/23** (6th Grade).  Student had a D+ in Math and an F in Social Studies.

108.     By the first week of the 2nd Quarter, **11/1/2023** (6th Grade), Student was already failing Orchestra and Math. These were the only grades posted at the time.

109.     Accommodations did not provide sufficient support (DP Exh. P31 "…there are concerns about the student's educational progress. Although there may have been interventions implemented, concerns about his/her progress continue").

110.     Student continued to fail as a direct and proximate result of Defendants failure or refusal to do their job as required for Plaintiffs.

111.     On **12/7/23** (6th Grade), Parents produced a written request for re-evaluation for Special Education to return Student to an IEP and for mediation. This was sent to middle school teachers, administration, and district personnel.

112.     School Psychologist, Brandon Segura, claimed Parents changed their minds about the evaluation during a phone call.

113.     Parents wanted an effective 504 plan or a return to an IEP under Special Education. The District failed or refused to do their job as they offered neither despite, Plaintiffs observations, demonstration of failure of Student, or grave concerns of the impact of continued failure.

114.     On **12/18/23** (6th Grade) District produced a Prior Written Notice (PWN) of refusal to re-evaluate for Special Education.

115.     On **1/2/24** (6th Grade) Parent received a "Secondary Progress Letter" indicating Student was "in danger of failing the courses (Orchestra, Math, STEM concepts, Soc Studies, Art) for the semester."

116.     On **1/8/24** (6th Grade), a third 504 meeting was held at parent's request.

117.     On **1/11/24** (6th Grade), Student's End of 2nd Quarter Grades were as follows: D+ (Math), C (Orchestra), C (Science), F (Social Studies), C+ (STEM).

118.     On **1/29/24** (6th Grade), Parent emailed District regarding inconsistent 504 plan implementation.

119.     Student began to demonstrate school refusal.

120.     School refusal refers to Students unwillingness or hesitancy to attend school.

121.     On **1/30/24** (6th Grade), Principal emailed Parents. At Parent request, District agreed to conduct a Functional Behavior Assessment (FuBA). The FuBA was never conducted.

122.     On **2/1/24** (6th Grade), Parents sought legal representation.

123.     On **2/13/24** (6th Grade), Principal emailed Parents and again mentioned the Functional Behavior Assessment (FuBA).

124.     The FuBA was never conducted, even though Consent to Evaluate was sent home, signed, and returned to the school.

125.     The permission for the FuBA did not use Special Education paperwork. Dr. Segura gathered some data on Student, but no final product was created, discussed with the team, or provided to Parents representing another failure or refusal of Defendants to

comply with the law regarding the implementation of programs designed to provide FAPE.

126.     On **2/13/24** (6th Grade), a fourth 504 Meeting was held to amend the 504 at Parent's request.

127.     On **2/16/24** (6th Grade), Parent emailed District regarding the inconsistent 504 plan implementation.

128.     District responded stating Student would be withdrawn from his 5th period Physical Education (PE) class and assigned to an "ASC" for 5th period so an aide, Mr. Martinez, could support his executive functioning needs.

129.     Student was disappointed and discouraged to be dropping his PE class. He enjoyed this class and benefitted from the physical activity and the success he felt in athletic endeavors.

130.     Later, Parents learned Mr. Martinez took his lunch period away from the ASC during 5th period.

131.     On **3/1/24** (6th Grade), attorney for Parents again requested a Special Education Evaluation. District finally agrees to evaluate.

132.     On **3/1/24** (6th Grade), Parent signed consent for a Special Education Evaluation.

133.     On, **3/22/24** (6th Grade), Student's End of 3rd Quarter Grades were as follows: F (English), F (Math), D- (Orchestra), F (Science), D- (Social Studies).

134.     Student began to refuse to go to school, or called home so often for a pick-up, that Parents eventually removed Student from school at the end of 6th Grade, rather than allow him to face more failure and frustration due to Defendants failure or refusal to provide FAPE.

135.     Parents arranged to bring Student back to school to take Special Education assessments.

136.     Despite this effort, Mr. Segura did not complete the Functional Behavior Assessment (FuBA).

137.     In two IEP meetings on **5/28/24** and **5/30/24** (6th Grade), Student's Special Education testing revealed Student **re-qualified for an IEP with a specific learning disability in social/emotional learning, communication, mathematics and writing.**

138.     Despite mixed results on Autism screeners, the Team returned the original diagnosis, and recognized Autism is Student's primary disability.

139.     Parents requested aide support for Student's executive function deficits in general education classes.

140.     As early as October 2022, Student clearly articulated in writing his need and desire for an aide (he called it a "Buddy") to help him do well in school.

141.     District refused, citing lack of (unspecified) data. No Prior Written Notice ("PWN") was given at this time.

142.     The request was made repeatedly throughout 6th Grade, with similar refusals. Prior Written Notice (PWN) was not provided until 12/18/23 (DP Exh. P41).

143.     Parents asked again on 2/8/24 (DP Exh. R105) and were rejected again on 5/31/24 and 6/4/24.

144.     On **6/9/24** (6th Grade), District produced a Prior Written Notice (PWN) and again refused to provide an aide. This notice was mistakenly dated 12/18/2023.

145.     Unfortunately, efforts to reintegrate Student into school this fall (2024-2025) were unsuccessful due to the cumulative effects of damaged relationships between Student and

school staff and the emotional impact of inadequate support leading to repeated school failure.

146.     This is precisely the result Plaintiffs made every attempt and exhausted their resources to avoid prior to Students enrollment in kindergarten. They sought the evaluation, assistance, and programs for the success of their child, Student and Defendants failed or refused to meaningfully fulfill their obligations.

147.     On **8/14/24** (7th Grade), a rushed, 30-minute meeting was held to review Student's IEP with his new teachers.

148.     Prior to Plaintiff's arrival at the 08/14/24 IEP meeting, Mrs. Aardema "advised that Mrs. Wilkes was not happy…"

149.     Although an agenda was emailed to Plaintiffs in advance, indicating that the meeting duration would be approximately 55 minutes. (Exh. P68.), Principal opened the meeting by announcing that teachers would be dismissed after only 30 minutes. (12-19-24 Tr. 174:20-175:25).

150.     Principal (SK) persistently interrupted Plaintiff to remind her teachers would be leaving soon.

151.     Principal (SK) later solicited hurtful and harmful letters from teachers accusing Parent of misconduct and vulgarity, due to Parent (RW) using a single curse word as she voiced her frustration through an analogy. (12-19-24 Tr. 174:14-19).

152.     The letters included the following rude remarks: "After Ms. Wilkes's five-minute long speech on this topic…" "While it may seem like a small and simple thing to ask of [Student's] teachers, it does show Ms. Wilkes failure to see the big picture of what education is like in a middle and high school setting. Harrison is currently 1 of 32

students I will have in my class." "Parent's legal counsel…arrived late, unannounced, and uninvited." "It felt like she was trying to increase the scope or requirements of the accommodations."

153.    These letters were only later revealed and provided to Parents as evidence just days prior to due process determination hearing.

154.    Attorney for District failed to attend, several teachers came late, and the agenda sent prior to the meeting was not followed.

155.    Plaintiff did not have sufficient time to make sure teachers understood Student's past experiences and accommodation needs.

156.    On **8/16/24** (7th Grade), Parent requested information from each of Student's teachers about strategies used for students with IEPs and the Vice Principal responded by stating that teachers would not be responding. She then personally provided only generic responses to Parent's questions.

157.    By **9/1/24** (7th Grade), Student was failing three classes.

158.    On **9/1/24** (7th Grade), Student became dysregulated at school.

159.    Shelly Karen, Principal, emailed Parents stating that District, "will not tolerate disrespectful behavior..." She was referring to Student walking out of the room and slamming a door.

160.    By **9/10/24 (7th Grade),** Student stopped attending school. Parents attempted to enroll Student in another district. This request was denied.  Parents filed for Due Process under the Individuals with Disabilities Education Act (IDEA) on October 16, 2024.

161.    A Due Process Hearing was held in the above-referenced matter on December 13, 16, 19, 20, 2024.

162.     Petitioners Brandon and Regan Wilkes ("Parents") were present during the Hearing representing their minor child, HW. Student, HW, appeared and testified.

163.     Family was represented by counsel, Amy Martz, ESQ, JD, MPA, MEd, NBCT.

164.     Nate Edvalson, Special Education Director for Canyons School District, was present on behalf of Defendant Canyons School District ("District"), which was represented by counsel Paul Van Komen and Jeffrey Christensen.

165.     This matter was assigned to Due Process Hearing Officer, Doulas R. Larson ("Hearing Officer").

166.     The Hearing was held in accordance with the procedural requirements of the Individuals with Disabilities Education Act ("IDEA") 20 USC § 1415 et seq., and 34 CFR §§300.507-515, and the Utah State Board of Education ("USBE") Special Education Rules ("State Rules") IV.M. 2-3 (a-e), June 2023.

167.     Student is now receiving day treatment in an Applied Behavior Analysis (ABA) facility as he works to process the traumatic experiences of the past 18 months and overcome the deficiencies in his educational opportunities.

168.     In the matter of the Individuals with Disabilities Education Act (IDEA) Due Process hearing, the Due Process Hearing Officer made the following procedural and substantive errors of fact and law:

1.  Violating the parents' and essential IEP team members' rights to participation.

2.  Relying on inadequate evaluations to justify exit from special education.

3.  Mischaracterizing the meaning of a parent signature on an IEP document.

4.  Failing to properly apply the FAPE standard when assessing student progress.

5. Misapplying the standard for relief by penalizing the parents rather than holding the district accountable.

169.    Failure to ensure meaningful parent participation in the IEP process (IDEA Procedural Violation). Violation of 20 U.S.C. § 1415(b)(1) and 34 C.F.R. § 300.322.

170.    The Decision and Order improperly downplays or disregards, the exclusion of the student's 5th Grade teacher, Ms. Smith, from the May 12, 2023, IEP meeting.

171.    Federal law mandates parents must be involved in the decision-making process regarding their child's special education placement.

172.    IEP team members, including key teachers, must participate **unless the school district obtains informed written consent from the parents to excuse them** (20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321(a)).

173.    Here, Parents naively signed a consent to excuse her. They arrived at the meeting to find her not present and were informed they could sign or cancel the meeting. Parents were not informed of the significance of having a General Education Teacher in the IEP exit and 504 enrollment process, particularly in regards to accommodations that were already being implemented.

174.    Parents did not want to delay the meeting yet again, so they signed the consent form without understanding how necessary she was to the process of establishing Student's needs.

175.    *Doug C. v. Hawaii Dep't of Educ.,* 720 F.3d 1038 (9th Cir. 2013), held that a school district's failure to meaningfully include parents in an IEP meeting constitutes a denial of FAPE.

176.     Similarly, *Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516 (2007), reaffirmed that parents are integral decision-makers in their child's special education plan.

177.     The decision fails to consider whether Ms. Smith's absence significantly deprived the parents of a knowledgeable voice in the determination of the student's needs, violating IDEA's procedural safeguards including the Inadequate and flawed evaluation used to justify exit from Special Education a substantive violation of 20 U.S.C. § 1414(b)(3) and 34 C.F.R. § 300.304(c)(4).

178.     District's reevaluation failed to comprehensively assess Student's educational needs before determining he was no longer eligible for special education.

179.     IDEA requires that evaluations must be "sufficiently comprehensive to identify all of the child's special education and related service's needs" (34 C.F.R. § 300.304(c)(6)).

180.     The IEP team relied predominantly on out-of-date assessments rather than a comprehensive psychoeducational evaluation to determine that the student no longer required services.

181.     This ignores *D.B. v. Esposito*, 675 F.3d 26 (1st Cir. 2012), where the court ruled that a school district must rely on a comprehensive set of data sources rather than selective, insufficient testing.

182.     The Supreme Court's decision in *Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386 (2017), also made clear that an IEP must be "appropriately ambitious in light of the child's circumstances." The hearing officer ignored whether the exit decision met this standard.

183.     The decision does not discuss whether the district provided a specific instructional methodology necessary for the student to receive a FAPE.

184.     Failure to properly consider methodology for continued educational progress, is a violation of 34 C.F.R. § 300.39(b)(3) (Specially Designed Instruction).

185.     The Second Circuit has ruled in *R.E. v. New York City Dep't of Educ.,* 694 F.3d 167 (2d Cir. 2012), that a district must include methodology in an IEP when it is necessary for the student to receive meaningful educational benefit. The failure to consider this, particularly given the student was thriving in a structured, accommodated setting, is a substantive violation.

186.     The school district's decision to remove the student from an IEP, despite evidence of ongoing needs, denied FAPE.

187.     Denial of FAPE due to improper removal from Special Education is a violation of 20 U.S.C. § 1412(a)(1) (Right to a Free and Appropriate Public Education (FAPE)).

188.     In *M.C. v. Antelope Valley Union High School District*, 858 F.3d 1189 (9th Cir. 2017), the court ruled that procedural violations rising to a substantive denial of FAPE occur when a child is exited from special education without sufficient justification.

189.     Defendant failed to show Student's progress was attributable to the general education environment rather than the special education services received. Courts, including in *Polera v. Bd. of Educ. of Newburgh*, 288 F.3d 478 (2d Cir. 2002), have held that an unjustified removal from special education violates IDEA.

190.     District had an obligation to conduct a thorough and timely reevaluation of student's school and parent identified needs to find and determine Students necessary accommodations.

191.     This process is referred to as Child Find.

192.     Failure to meet Child Find obligations to identify and serve a student in need of Special Education violates 20 U.S.C. § 1412(a)(3)(A) and 34 C.F.R. § 300.111.

193.     Defendants Child Find failures are the modus operandi of Defendants.

194.     Defendant has demonstrated a blanket practice of ignoring anticipated needs of children as they transition between elementary and secondary schools by removing students with disabilities from IEP's.

195.     The testimony of another parent of a student in District (RS) demonstrated District's modus operandi, a pattern or practice of behavior that is relevant to understanding District's likely actions in a specific instance.

196.     Parent (RW) also testified she spoke to other parents similarly situated.

197.     Several other District parents were willing to testify to a similar set of facts. Establishing such a pattern supports the argument that District's decision in this case may have been motivated by systemic factors rather than an individualized determination of Student's needs.  Parent (RS)'s testimony should be found both relevant and meaningful under IDEA's relaxed rules of evidence and used to confirm Parents' claim that this is a pattern of practice in District.

198.     The Due Process Decision and Order acknowledges delays in this process but does not find they amounted to a denial of FAPE. However, federal law is clear that a failure to conduct timely and appropriate evaluations violates the Child Find requirement.

199.     In *Compton Unified Sch. Dist. v. Addison,* 598 F.3d 1181 (9th Cir. 2010), the Ninth Circuit held that a school district's failure to evaluate and identify a child in need of Special Education constituted a direct violation of IDEA.

200.    The decision also contradicts *El Paso Indep. Sch. Dist. v. Richard R.,* 567 F.
Supp. 2d 918 (W.D. Tex. 2008), where the court found that delays in identifying a
student's disability led to a substantive deprivation of FAPE.

201.    The hearing officer misapplied parent's decision to remove the student from the
district rather than focusing on whether the district provided an appropriate IEP.  In
violation of 20 U.S.C. § 1415(f)(3)(E).

202.    Courts have ruled that where a school district fails to provide FAPE, the burden
shifts to the district to prove that its alternative (such as a 504 Plan) was appropriate
(*Schaffer v. Weast,* 546 U.S. 49 (2005)).

203.    Additionally, in *Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230 (2009), the
Supreme Court ruled that a parent's decision to seek private services does not absolve the
school district of its obligation to provide FAPE. The hearing officer's decision
contradicts this ruling by improperly shifting the burden onto the parent rather than
assessing whether the IEP provided an appropriate education.

204.    Each of these errors provides strong grounds for appeal under federal law as well
as related claims against Defendant for failing to provide a Free and Appropriate Public
Education (FAPE).

205.    A self-executing constitutional clause is one that can be judicially enforced
without implementing legislation.


## STANDARD OF REVIEW

206.    This complaint appeals a Due Process Hearing and adds Causes of Action for
other Federal and State claims.

207.    When the Individuals with Disabilities Education Act (IDEA) administrative record is fixed, as here, the District Court conducts a "modified de novo" review in that it "evaluate[s] the record and determine[s] whether a preponderance of the evidence indicates that the Due Process Hearing Officer's decision should be reversed." Jefferson County Sch. Dist. R-1 v. Elizabeth E., 798 F.Supp.2d 1177, 1184 (D. Colo. 2011), aff'd, 702 F.3d 1227 (10th Cir. 2012).  As the Due Process Hearing Officer only adjudicated the claims under IDEA and determined that he lacked subject matter jurisdiction over the ADA and 504 claims, this standard applies only to the Second Cause of Action.

208.    Plaintiffs are an aggrieved party, who has filed this suit to appeal the due process hearing officer's decision.  Federal law requires this court to: (1) receive the records of the administrative proceedings, (2) hear additional evidence at our request, and (3) grant Plaintiff's relief that the court determines to be appropriate.  20 U.S.C. 1415(i)(2)(C).  34 C.F.R 300.516(c).

209.    All other Causes of Action should be adjudicated by the District Court's authority as the initial trier of fact.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Civil Rights Act of 1871 ("CRA 1983")**
**42 .S.C. § 1983**

210.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

211.    Civil Rights Act of 1871 ("CRA 1983") 42 U.S.C. 1983 creates a cause of action for "Every person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State…subjects, or causes to be subjected, any citizen of the United States… to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" (42 U.S.C. 1983 9.3).

212.     Defendants deprived Plaintiffs of their federal constitutional and statutory rights by failing and refusing to provide student with the educational and public service accommodations and modifications mandated by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

213.     To establish such a violation, Plaintiffs must prove that Defendants treated Student differently due to his disability, without sufficient justification through the following elements:

　　　1.  The discrimination must involve a government entity,

　　　2.  An individual with a disability was treated differently than those without disabilities, as proven through policies or practices that create an unjustified disparity,

　　　3.  The actions must have a discriminatory effect or be applied in a discriminatory way.

214.     Here, Defendants are a public school district and, therefore, a government entity.

215.     Here, Defendants identified Student's disability every year since 2017.

216.     In May 2023, during his 6th grade year, they removed his IEP and eliminated specially designed assistance and or programs designed to provide FAPE.

217.     Nevertheless, he remained a person with a disability under Section 504.

218.     Upon information and belief, other students with disabilities were not removed from their IDEA Individualized Education Program (IEP) plan.

219.     By removing Student from his IEP, not only did Defendants treat him differently from other similarly situated students, but they also denied him a FAPE.

220.     Other students with disabilities attending Indian Hills Middle School and District schools received a FAPE.

221.     This inequal treatment by a government entity violates the Equal Protections clauses of both the 14th Amendment to the U.S. Constitution and Article I Section 24 of the Utah Constitution.

222.     Courts typically apply a rational basis review to disability-based classifications.

223.     Defendants must show its action is rationally related to a legitimate state interest.

224.     In cases involving fundamental rights, a higher level of scrutiny applies.

225.      Here, the Due Process Hearing Officer for this case is employed as an attorney for a school district that borders Defendants' district.

226.     He was hired by the Utah State Board of Education.

227.     He unjustifiably ruled Defendants did not violate Students Individuals with Disabilities Education Act (IDEA) rights by removing his IEP during his sixth-grade year.

228.     Plaintiffs asserted then and assert now, Defendants removal of Student from his IEP denied him FAPE.

229.     When a student is denied FAPE courts have repeatedly ruled it is a violation of Constitutional and Statutory provisions under both IDEA and 504.

230.    The following year (7th grade), at Indian Hills Middle School, Defendants returned Student's IEP and resumed providing specialized instruction and related services.

231.    Student was damaged because of the unjustifiable removal from his IEP and corresponding services that deprived him of a FAPE for an entire school year.

232.    If the Court finds Defendants violated §1983, the court should grant compensatory damages, punitive damages, and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq.

233.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

234.    IDEA, which stands for the Individuals with Disabilities Education Act, is a U.S. federal law that guarantees students with disabilities the right to a Free and Appropriate Public Education (FAPE) in the least restrictive environment (LRE).

235.    IDEA applies to all public-school districts and Utah charter schools, because they receive federal funding. Section 504 (20 U.S.C. § 1400 et seq.).

236.    IDEA as authorized and reauthorized explicitly states that any public school or institution receiving federal funds must comply with its requirements.

237.    Defendants receive federal funds and are subject to IDEA.

238.    Under 20 U.S.C. § 1401(9) and 34 C.F.R. § 300.17, FAPE means special education and related services provided at public expense, meeting the state's educational

standards, designed to meet the unique needs of the child, and are provided in conformity

with an Individualized Education Program (IEP).

239.     Proving a FAPE violation requires demonstration the school failed to develop,

implement, or properly follow an appropriate IEP plan.

240.     When they removed Students IEP, Defendant did not provide academic or

behavioral support necessary to provide FAPE.

241.     To prove a Violation of the Individuals with Disabilities Education Act (IDEA),

20 U.S.C. § 1400 et seq., a plaintiff must establish the following key elements:

242.     Plaintiff must show the student is eligible for protections under IDEA by meeting

the definition of a child with a disability under 20 U.S.C. § 1401(3) which is defined as

follows:

243.     The student must be evaluated and diagnosed with at least one of the following

categories of disabilities recognized under IDEA:

    a)  Intellectual disability

    b)  Hearing impairments (including deafness)

    c)  Speech or language impairments

    d)  Visual impairments (including blindness)

    e)  Serious emotional disturbance (referred to in IDEA as "emotional

       disturbance")

    f)  Orthopedic impairments

    g)  Autism

    h)  Traumatic brain injury (TBI)

    i)  Other health impairments (OHI) (such as ADHD, anxiety, or depression).

    j)  Specific learning disabilities (SLD) (such as dyslexia, dyscalculia, dysgraphia).

    k)  Deaf blindness.

244.    The disability must adversely affect the child's educational performance and necessitate specialized instruction.

245.    This definition of "child with a disability" under IDEA is crucial for ensuring children like Student receive the appropriate education and services they are legally entitled to.

246.    *Endrew F. v. Douglas County School District*, 580 U.S. 386 (2017) found that schools must offer an IEP allowing for meaningful progress, rather than minimal advancement.

247.    Student was first diagnosed as a person with Autism at the age of three and his first IEP was written in 2017 when he was in kindergarten.

248.    During all years of elementary school, he was eligible for an IEP.

249.    The provisions provided in his IEP included, but were not limited to, speech services in kindergarten through the 5th grade.

250.    In the 4th grade, the Speech and Language Pathologist communicated to the IEP team that Student was not anticipated to need speech and language services, but Parents reminded the IEP Team of Student's need for social skill development due to Autism, and an IEP was written with speech goals to improve social communication.

251.    In 5th grade, Student had a competent teacher who was providing a variety of accommodations, such as a desk outside the classroom where student could work in a quieter setting, a break space inside the classroom, and help with dysregulation.  These

accommodations, though essential to Student's success, were not documented in his IEP. In fact, not a single accommodation was documented in the IEP.

252.    In May of 2023 (5th Grade), Student was declared ineligible for an IEP in the last two weeks of his elementary school career.

253.    Defendants immediately created an inept and doomed 504 plan.

254.    However, during his 6th Grade year, Student's educational harm was evidenced by failing classes, episodes of dysregulation, and increasing school refusal.

255.    District failed to conduct proper evaluations and reevaluations, violating its obligations under 34 CFR § 300.303, § 300.304 and §300.305. Assessments did not address all areas of suspected disabilities and relied on outdated data. District committed the following violations: Student's March 2020 reevaluation was delayed by 10 months, Student's January 2021 evaluation used outdated assessments and omitted critical areas like academic performance and sensory needs, and Student's May 2023 reevaluation, used to exit Student from Special Education, was inadequate. These failures contributed to a denial of a FAPE.

256.    **2020 Reevaluation.** Permission to test for Cognitive/Intellectual, Social/Behavioral and Communication skills was obtained in March of 2020. Concerns listed on the PWN form include, "[Student] continues to demonstrate decreased social language/social skills which impacts his ability to effectively collaborate and engage with peers." However, COVID-19 struck during Student's 2nd Grade year, disrupting his 3-year re-evaluation. District promised, "A thorough evaluation will be conducted within 30 days of school resuming." (Exh. P6). This document contains a sticky note reading, "Backdate to 10/26/20," indicating testing was not actually initiated by 10/26/2020 and

reveals District's practice of falsifying information. The evaluation was not completed when school resumed in the fall. As a result, evaluation results were delayed by 10 months. In Hearing, Speech Teacher (KW) testified that meetings held remotely did not always result in signed documents the same day. She stated, "we weren't signing documents the same day we had meetings. There was a lot going on" (Tr. 344:17-19). FAPE was denied as Student's IEP did not reflect goals relevant to his needs and contained deficiencies due to lack of evaluation data.

257.    **2021 Evaluation.** Student's Special Education eligibility category was Autism. When the Post-COVID evaluation was finally concluded, no academic testing was conducted. No observations appear on the report. (Exh. P8a). FAPE was denied as Student's IEP did not reflect goals for his academic or social needs due to lack of evaluation data.

258.    **2023 Reevaluation.** After missing Student's 5th Grade IEP annual review deadline in January 2023, District requested permission to evaluate in March 2023. Areas for evaluation included Communication, Adaptive, Soc/Beh, and Observations. Results of this evaluation were presented in May of 2023 and relied upon data up to eight years old, excluding necessary assessments in executive functioning and academics.

259.    Under the IDEA, the "Child Find" mandate extends to ensuring that students who fail screenings or demonstrate potential educational deficits are promptly and appropriately evaluated. (34 CFR § 300.111). According to 34 CFR § 300.301, a district must conduct a full and individualized initial evaluation to determine 1) whether a child has a disability and 2) to determine the student's educational needs. A screening tool does not fulfill the requirement for a comprehensive evaluation but is designed to identify

students with additional needs in each educational area. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley* established that schools must conduct evaluations and provide appropriate services when a student is "suspected" of having a disability, which could include situations where a student fails initial screening tests. 458 U.S. 176 (1982).

260.     Here, District had an obligation to conduct comprehensive evaluations following failed screenings. Failure to respond to known screening data led to missing assessments, which led to disqualifying Student which led to a year of struggle, before finally being reevaluated and identified as a student with a specific learning disability. FAPE was denied.

261.     District was on notice of Student's academic deficiencies. Student's 4th Grade end of year report card indicated Student had "not yet mastered" 71% (10 out of 14) of Language Arts skills. Student had "not yet mastered" 100% (7 out of 7) of science skills (Exh. P54b). August 2022 results from the Scholastic Reading Inventory showed a Lexile of 595 Below Basic (Proficient = 865). November 2022 results showed a Lexile of 670 Basic (Proficient = 865) (Exh. P10). The evaluation report from 5/12/2023 reveals Student's reading comprehension was "Well Below" grade level (Exh. P51). Despite these indicators of academic deficits, no academic evaluations or changes to Student's IEP were made.

262.     The evaluation report used in the 5/12/2023 meeting lacked essential student data and indicated, "Spring benchmark data were not available at the time of this report." No current emotional/behavioral evaluation was included. For the second evaluation in a row, no valid observation data was reported (Exh. P11). Parent input was not included as the completed rating scales on the ABAS-II adaptive test and SRS-2 were "not

available."  When asked if this evaluation was complete, Principal (NS-V) said she did not know.

263.    Witnesses claimed that Student's 5th Grade academic performance was adequate and testified that his end of year RISE testing was proof of academic achievement. However, this information could not have been considered when disqualifying Student in May of 2023, as Principal (NS-M) testified that the RISE results for Mathematics and Science were **not yet available** at the time of his May 12, 2023, IEP.

264.    Sensory evaluations were not conducted, though the 504 created the same day referenced sensory needs. Although Student's 5th Grade IEP contains zero accommodations, General Education Teacher (KS) testified that she had provided Student with accommodations responsive to his sensory needs, such as a seat away, breaks, and permission to work at a desk in the hallway when needed. If sensory needs were obvious, a formal sensory assessment was warranted. Changes to Student's 504 plan on 10/16/23 (6th Grade) identified situations where additional sensory accommodations were needed.

265.    Few behaviors interfere more with a student's education than refusal or inability to attend school. Under the IDEA, District had a duty to address this behavior by "consider[ing] the use of positive behavioral interventions and supports and other strategies" (34 CFR § 300.324(a)(1)(i)).

266.    In *Lexington County School District One v. Frazier*, the court held that a district's failure to implement positive behavioral interventions and supports [PBIS] for disability-related absences constitutes a denial of FAPE. 57 IDELR 190 (DSC 2011). The court emphasized that when a district is aware of patterns of absenteeism linked to a student's

disability, it must act promptly to identify the underlying issues and implement targeted interventions.

267.     Here, Student's attendance changed from exemplary to debilitating, and District failed to respond. Multiple witnesses testified that Student had excellent attendance in elementary grades 3, 4, and 5 (Exh. 54a-c), demonstrating Parents' commitment to school attendance. Student's accumulating absences during 6th Grade were directly linked to Autism symptoms of emotional dysregulation and anxiety, well-documented by District's own Social Emotional Learning (SEL) logs. Despite this, District failed to develop a Functional Behavioral Assessment (FuBA), implement a Behavior Intervention Plan (BIP), try any positive behavioral support and interventions, and provided no specialized instruction. (12-19-24 Tr. 66:16-27:1) As the *Frazier* case underscored, such omissions violate IDEA's procedural and substantive requirements, depriving Student of access to education.

268.     When asked how District responded to Student's absences, Principal (SK) testified that the attendance secretary is responsible for referring students to the Student Support Team (SST) for attendance concerns. When asked if a FuBA would be an appropriate response to school refusal she said it is possible, but "not frequently done" and was not done for Student. She also testified that no attendance letters were sent for Student during his 6th Grade year. (12-19-24 Tr. 119:17–122:5).

269.     Although District tried to paint Student's lack of attendance as a parental decision, Parents testified the absences were attributable to episodes of dysregulation. Evidence of parent support for Student attending school was demonstrated by the many meetings initiated by Parent with Student and 504 Coordinator/Social Worker (SG). SEL

logs contain thirteen (13) documented meetings to address Student's feelings (8/15/23, 8/25/23, 8/25/23, 9/11/23, 10/16/23, 12/4/23, 1/8/24, 1/22/24, 1/22/24, 1/31/24, 2/1/24, 2/16/24, 2/26/24) and four (4) of instances of Student contacting Parent from a personal device requesting a pick up from school (2/1/25, 2/15/24, 3/4/24, 9/9/24). District's inaction left Student without necessary tools to overcome attendance-related barriers, perpetuating a denial of a FAPE (Exh. R250-262).

270.    Between 2/2/22 and 3/5/24, District documented over 25 instances of Student's dysregulation, demonstrating consistent emotional struggles and unmet behavioral needs. Early incidents included anxiety over a peer's seizures (2/2/22, 2/16/22) and counseling sessions addressing stress and peer interactions (8/1/23, 8/25/23). These challenges persisted with documented struggles in specific classes (9/11/23, 10/5/23) and increased distress over unmet accommodations and loud environments (11/30/23, 12/4/23). Following 2/1/24, incidents escalated, including emotional breakdowns related to substitute teachers, noise, and class demands (2/1/24, 2/15/24, 2/26/24, 3/4/24, 3/5/24) (Exh. R250-262).

271.    Parents requested a FuBA for Student on or before 01/26/24. On 01/26/24, the school psychologist requested clarification on specific behaviors to be assessed. Parents responded on 01/30/24, defining the behavior as "severe anxiety, manifested in emotional outbursts from him, negatively affecting his overall mental health." On 02/12/24, School Psychologist (BS) ignored Parents' response, unilaterally redefining target behavior as "meltdowns." He told parents only one incident on 01/02/24 met this definition. This assertion directly contradicts the SEL log, which documents at least nine (9) relevant incidents which predate his email.

272.    Despite clear data reflecting a pervasive need for specialized behavioral supports and instruction, District failed to ever finish a FuBA or develop a BIP, violating its obligations under IDEA resulting in a denial of a Free and Appropriate Public Education (FAPE).

273.    District's failure to develop and revise Student's IEP appropriately resulted in a denial of a FAPE. 34 CFR §300. 324 mandates that schools develop and implement an IEP that is tailored to the unique needs of the student. A signed and finalized IEP is a legally binding document. In *C.F. v. Capistrano Unified School District*, 654 F.3d 975 (9th Cir. 2011), adopted by the 10th Circuit in interpreting FAPE requirements, the court emphasized that once accommodations are included in an IEP, their implementation is mandatory and not subject to discretionary enforcement by individual teachers or staff. Here, failure to develop an appropriate IEP, revise it when progress was inadequate, and include necessary accommodations hindered Student's academic and functional progress, increased educational disparities, and increased social emotional challenges.

274.    Here, IEPs in 2021 and 2022 omitted necessary supports for Autism, academic deficits, executive functioning, and provided no accommodations. The missed annual review in January of 2023 left goals outdated for five (5) months. The next year, requests for key supports, including a daily tracker, study skills class, and executive functioning interventions, were ignored. Accommodations added to the 504 were unknown or refused by staff, as seen when cafeteria staff denied Student's requested breaks and teacher refused to fill out Student's tracker. (12-19-23 Tr. 69:2-4).

275.    Regarding speech services mandated in Student's 5th Grade IEP, District failed to provide 172 minutes (45%) of assigned speech minutes, based on educational records

provided to Parents. Speech Teacher (KW) claimed, inaccurately, that speech minutes on an IEP could be reduced each month based on holidays or days off of school. (12-13-24 Tr. 357:4-358: 2) When asked who trained her to believe this, she could not remember. It is this type of blatant misinformation that results in constant violations of IDEA in this District.

276.    District then attempted to enter additional records of speech logs that were never included in the documents provided to Parents in response to their records requests, nor were they provided five (5) business days prior to the hearing when exhibits were due. Referring to services provided two years ago, Speech Teacher (MF) was asked to recall under oath exactly which dates she provided services and how many minutes were provided to Student on each date. Used to "refresh the witness's recollection" the "new" speech logs attempted to show all minutes were provided, though she could not explain where the new documents came from or why they had not been provided originally. She later testified that she was unable to recall any details from any given service day (Tr. 105:11-12). She was likewise unable to recall exactly what year she had begun to work for District (Tr. 105:19-25). This witness should be found **not credible**. Student was disqualified from Special Education based on this individual's assertions after failing to comply with his IEP service time and to conduct an annual IEP review.

277.    District failed to include all required participants in Student's IEP meetings as required under 34 CFR § 300.321. In *Allen Park Public Schools,* 5 ECLPR 53 (SEA MI 2007), the court found that because a general education teacher had not been part of the IEP meeting, the District had failed to appropriately consider the student's ability to participate in the general education program. 34 CFR § 300.324 (a(3).

278.    Here, no General Education or Special Education teacher attended the May 2023 IEP meeting. Input from the General Education Teacher (KS) was necessary for understanding Student's day-to-day classroom needs (12-16-24 Tr. 10:4-11:14). She alone could speak to the assessment results she provided as part of his evaluation. Additionally, zero accommodations appeared on Student's IEP, yet she was providing necessary accommodations to Student (DP Exh. P60-61). These were not recorded on any document provided to parents or considered by the team.   She testified that she told the team immediately after being invited that she would not be able to attend the 5/12/23 meeting due to a pre-existing commitment out of state (12-16-24 Tr. 18:16-17). District did not attempt to find a meeting date or time she could attend.

279.    Student is a child with an Autism diagnosis, yet no Special Education Teacher was even invited to the IEP meeting (DP Exh. P61). Input from a Special Education Teacher was essential to the IEP team's consideration of specific instruction for executive functioning, emotional regulation, and social skills. Speech Language Pathologist (KW) affirmed that no Special Education teacher had been invited to the 5/12/2023 meeting and said she did not know why (Tr. 328-12-22; Exh. P12). Student's Autism put his potential skill deficits and needs for services outside of the Speech/Language Pathologists scope of practice. A credentialed Special Education Teacher is more qualified to recognize skill deficits (as opposed to merely pragmatic language) and ask needed questions about student academic performance. A year later, Student would qualify as a child with a specific learning disability in mathematics and written expression. He was cruelly left to struggle when basic testing, performed by a Special Education Teacher, could have discovered his needs for specially designed instruction as well as functional skills. The

omission of required IEP Team members deprived the team of essential insights and led to the improper decision to exit the student from Special Education.

280.     Plaintiffs were dismayed and disappointed in the school's decision to remove Student from his IEP.

281.     Defendant failed to fulfill its Child Find obligations under 34 CFR § 300.109 and 300.111(a)(1)(i). "All children with disabilities...regardless of the severity of their disabilities and who are in need of Special Education and related services, are [to be] identified, located, and evaluated."

282.     The 10th Circuit in *D.T. by and through Yasiris T. v. Cherry Creek School District No. 5*, held that a district's Child Find obligation is to "proactively identify, locate and evaluate student with disabilities who may need Special Education or other academic supports." 55 F4th 1268, 1273 (10th Cir, 2022). IDEA places the affirmative obligation of Child Find squarely on districts shoulders and suspicion of a disability "may be inferred from written parental concern, the behavior or performance of the child, teacher concern **or** a parental request for an evaluation." *Wiesenberg v. Bd of Educ. Of Salt Lake City Sch Dist.*, 181 F. Supp. 2d 1307, 1311 (D. Utah 2002).

283.     While parents have the right to request assessments and may provide advocacy for their child's needs, Child Find is not the parent's duty. Child Find is a District's "nondelegable responsibility." *Jana K. ex. Rel. Tim K. v. Annvill-Cleona School Dist.*, 39 F. Supp. 3d 584, 602 (M.D. pa 2014).

284.     Here, District had a plethora of evidence during the 2023-2024 school year (6th Grade) to indicate that Student needed Special Education and related services during

middle school. Both Parent (RW) and Student testified about the difficulty navigating school software to track, complete, and turn in assignments. (DP Exh. P65).

285.     Plaintiff concern was clear and ongoing as demonstrated by numerous e-mails with school personnel and various in person meetings (DP Exhs. P28, P29, P35, P57, P63, P65, P68, P72, P73, P74.)

286.     Teacher concerns were represented in teacher surveys. (DP Exh. P23).

287.     Student sought out school counselor and psychologist for emotional regulation, both before and during school, as documented in SEL notes from the wellness staff.

288.      These detail repeated episodes of distress or needing help to solve a problem. (Exh. R250). Significant decline in both academic performance and attendance was obvious compared to Student's elementary records. (Elementary Report Cards, DP Exh. P54a-c; Report Card of 10/27/2023, DP Exh. P54d; Grade Report of 11/1/2023, DP Exh. P10; Academic failure notification of 1/2/2024, DP Exh. P38/P24; Report Card of 1/11/2024, DP Exh. 54d; Report Card of 03/22/2024, DP Exh. P54d). Any one of these was sufficient to trigger Child Find procedures by Defendant.

289.     Parent letter of 12/7/23 requested a Special Education evaluation (Exh. P20). Parent (BW) testified that the intent of the letter was to solicit support, procure an evaluation, and return Student to an IEP (12-19-24 Tr. 178:18-25; 179:1-5). School Psychologist (BS) testified that he had talked to Parent (RW) and claimed she was not requesting testing at that time. (12-20-24 Tr. 24:19-22). Nevertheless, District provided PWN of refusal to conduct an evaluation. (DP Exh. P21), though witness (BS) refused to even read the purpose of the PWN at the hearing. (12-19-24 Tr. 286:18-290:13) This delay caused significant harm by depriving the student of necessary services for months,

further exacerbating academic and social challenges and leading to a complete denial a FAPE. The fact that Parents put their concerns in writing and solicited help from district personnel provided District with sufficient information to initiate Child Find.

290.    District promised additional support from the Academic Support Center (ASC). Student's schedule was changed to drop a class to provide him a free 5th period to receive help from the ASC for understanding and completing assignments. (DP Exh. P63). ASC "Intervention Mentor" (AM) told Parents he would act as the liaison between Student and his teachers to communicate expectations. (DP Exh. P65). After a couple of productive sessions with him in January 2024, support quickly waned, and Parents later learned 5th period was AM's lunch break.

291.    By February, the ASC Mentor (AM) was expressing frustration to Plaintiff that Student demonstrated a "dogmatic unwillingness to do any work in the name of avoiding stress" and after showing Student a single strategy for recentering himself, declared, "I'm not sure how far his ability or willingness goes to actually use it when it's needed." (DP Exh. P65, Bates #326). (12-16-24 Tr. 284:15-286:4)

292.    A Special Education teacher should provide specialized instruction with proper PBIS training. Assistant Principal (KA) agreed that Student's need to consistently access the ASC was evidence of an increased need for support. (12-19-24 Tr. 59:7-10) Nevertheless, no evaluation was done. (DP Exh. P71).

293.    The most revealing testimony showing a failure of Child Find came from school personnel who could not articulate how a Special Education referral should be made. Assistant Principal (KA) and Principal (SK) were asked about Special Education referrals at the middle school and indicated that only **_one to two_** **Special Education referrals _per_**

*year* **came from classroom teachers** to the Student Support Team (SST). Neither administrator could articulate how a teacher would even initiate a referral. (12-19-24 Tr. 26:24-27:13) (12-19-24 Tr. 97:14-16, Tr. 106:21-107:4) When asked if Student had been referred to the SST, Principal (SK) testified that Student "was on our radar." Assistant Principal (KA) testified that Student was discussed in SST meetings frequently. District was aware of Student's challenges and distress, but did not follow its procedures to fulfil its child find obligations.

294.     District's Child Find failures are the modus operandi of Defendants.

295.     Federal Rules of Evidence 401-403 govern how information is presented and evaluated in legal proceedings. Evidence must be relevant to the case, meaning it makes a fact more or less likely to be true.

296.     Due process hearings are quasi-judicial administrative proceedings, <u>not bound</u> by strict evidentiary rules. The Court in *Schaffer v. Weast* acknowledged that IDEA provides sufficient procedural protections, including the ability to present relevant evidence, ensuring a fair hearing process. 546 US 49 (2005).

297.     The hearing officer's role as both factfinder and decision-maker allows for the flexibility needed to evaluate evidence without undue procedural constraints for the purpose of creating a complete and robust record. The relaxed rules of evidence are further justified by the unique nature and purpose of these proceedings to understand the student's needs and the appropriateness of the educational program, particularly as explained by non-expert parents or non-lawyer educators.

298.    Here, (RS)'s testimony makes Parents' claim of systemic decisions "more likely to be true" and the door should be <u>wider</u> than that provided by standard courts' rules for evidence.

299.    IDEA's requirement to provide an *Individualized* Education Program can be undermined by blanket practices or policies that result in substantially similar violations of IDEA. Courts and hearing officers have recognized the relevance of evidence showing a pattern of similar conduct to stablish context, motive, or intent. IDEA requires the IEP to be revised with the "child's anticipated needs" in mind. 34 CFR 300.324(b)(ii)(D).

300.    Here, District has demonstrated a blanket practice of ignoring the anticipated needs of children as they transition between elementary and secondary schools by removing students with disabilities from IEPs.

301.    The testimony of another parent of a student in District (RS) demonstrated District's modus operandi, a pattern or practice of behavior that is relevant to understanding District's likely actions in a specific instance.

302.    In that case, parent (RS)'s testified about her own experience of having her Autistic son removed from his IEP to his detriment, and her knowledge of other parents similarly situated in District [Defendant], demonstrated a systemic practice of District [Defendant] improperly removing students from Special Education during transitions between elementary and middle school and middle and high school. (12-13-24 Tr. 310:19-319:15)

303.    Parent (RW) also testified she spoke to other parents similarly situated. Several other District parents were willing to testify to a similar set of facts. Establishing such a pattern supports the argument that District's decision in this case may have been

motivated by systemic factors rather than an individualized determination of Student's needs. Parent (RS)'s testimony should be found both relevant and meaningful under IDEA's relaxed rules of evidence and used to confirm Parents' claim that this is a pattern of practice in District.

304. Defendant's actions denied Plaintiff the right to participate fully in Student's education, as required under 34 CFR §300.322.

305. The Supreme Court in the case of *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1* held that, "crafting an appropriate program of education requires a prospective judgment by school officials, informed by their own expertise and the views of a child's parents." 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017).

306. Additionally, the purpose of the IEP process is to ensure that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue. *Id*. at 1001. Defendant violated IDEA through failure to provide access to records, predetermination of eligibility, allowing systemic practices to override individual needs, and discounting parental concerns that should have led to Child Find.

307. Under IDEA (34 CFR §300.501(a)), parents [Plaintiff] have the right to access and retain copies of their child's educational records to meaningfully participate in the Individualized Education Program (IEP) process.

308. Failure to provide these documents impedes their ability to understand their child's progress, evaluate proposed interventions, advocate effectively for appropriate services, and meaningfully participate as members of Student's IEP team.

309.    According to Utah Special Education Rules IV.V.5, "Each LEA must permit parents...to inspect and review any education records relating to their student or themselves that are collected, maintained, or used by the LEA.

310.    The LEA must comply with a request without unnecessary delay and before any meeting regarding an IEP, or any hearing or resolution session, and in no case more than 45 calendar days after the request has been made." 34 CFR § 300.613. In *Amanda J. v. Clark County School District*, the court found that failure to provide "full records" to parents amounted to a "procedural violation [], which prevented [child's] parents from learning critical…information about their child, [which] rendered the accomplishment of IDEA's goals and the achievement of FAPE - impossible."  267 F.3d 877, 894 (9th Cir. 2001).

311.    Here, Parents made two thorough requests for records. The documents provided did not satisfy the requests. Some items requested were missing entirely, such as SEL logs presented for the first time during the resolution session (Exh. R250-262), and others had sections or pages omitted (Exh. P71, incomplete email threads). Parents made requests in writing for the student record to be supplemented with the missing items, even providing a detailed spreadsheet. District did not respond to these requests. The lengthy and revealing SEL logs from 2023-2024 were essential documents on Student's in school dysregulation. Mr. Martinez's logs of service, PBIS records, EdPlan documents, missing pages of email messages, and observation notes for the FuBA have never been provided. During the Hearing, many school employee witnesses referred to these never provided documents.

312.     Parents have the right to review every student record, paper and digital, to know their own child and to inform their input to the team about their child's education. Parents cannot participate meaningfully without these records.

313.     Hearing Defendant employees referring to documents denied to Plaintiff but used to justify Defendant's decisions related to Student's education, was beyond frustrating and confirmed Defendants failure to provide records significantly impeded Plaintiffs' participation in the IEP process denying FAPE.

314.     Defendants committed a violation of IDEA by predetermining to discontinue accommodations under either Students IEP or 504 accommodations.

315.     IDEA requires schools ensure parent participation in every IEP meeting. Failure to involve parents meaningfully, such as by predetermining decisions, violates this requirement. 34 CFR 300.322.

316.     IEPs must be developed through a collaborative process and be individually tailored to a particular student. Predetermination violates this process if decisions are made before the meeting or without full consideration of all team members' input. 34 CFR 300.324.

317.     Placement decisions, such as exiting a child from Special Education, must be decided by the team that includes parents. 34 CFR 300.501(c)(I). The court in *H.B. v. Las Virgenes Unified School District*, 48 (IDELR 31 (9th Cir. 2007, *unpublished*) held that showing a "state of mind" where Defendant allegedly predetermines an action is sufficient evidence to establish predetermination.

318.     Here, Defendant predetermined to remove Student from Special Education in May 2023, as evidenced by the following assertions.

319.    **Terminate prior year.** Principal (N S-M) stated in her testimony there was discussion at Student's 4th Grade IEP about releasing him from services, but the decision was made to continue to address his pragmatic language deficits (12-19-24 Tr. 333:5-11).

320.    **Advance of IEP**. Plaintiff testified during Student's 5th grade year, Principal (NS-M), approached him at a "Watchdog event," (a parent engagement initiative at the school) to tell him they wanted to meet to discuss Student's IEP.  Brandon understood this to mean Defendant wanted to release Student from his IEP. (12-13-24 Tr. 113:5-8).

321.    **Forms.** Plaintiff stated in the combined IEP/504 meeting Defendant already pre-prepared all the Special Education and 504 forms needed to exit Student from Special Education. (12-13-23 Tr. 128:19-129:1) (12-13-23 Tr. 302: 4-8). Principal (N S-M) confirmed the documents were prepared in advance and no changes to documents were made during the meeting. (12-19-2023 Tr. 350:21-351:1). The decision to exit Student from Special Education was predetermined.

322.    **One Meeting Note.** A single meeting note from 5/12/23 minimally documents both the IEP disqualification and the creation of the 504. The attendees were the same. No Special Education Teacher or General Education Teacher attended for either purpose. (Exhs. P13, P12).

323.    **Notice of Meeting forms.** Two different Notice of Meeting documents were prepared for the May 2023 IEP meeting revealing a sudden shift from multiple agenda items regarding preparing an IEP to a single focus on eligibility. (12-13-24 Tr. 69:18-70:2) This chart shows how the meeting agenda changed:

324.

| Original Meeting Notice (05/05/2023) | Revised Meeting Notice (05/12/2023) |
|---|---|
| 1. Develop the IEP and determine the least restrictive environment (LRE) 2. Review additional assessments and all available information 3. Review and discuss evaluation information and determine whether the student is eligible for Special Education and related services 4. Review the IEP and revise as appropriate | "Review and discuss evaluation information and determine whether the student is eligible for Special Education and related services." |

325.    Taken in isolation, these events might be viewed as mere procedural violations, but considering the totality of the circumstances, they amount to a state of mind of predetermination, which resulted in a substantive denial of a FAPE.

326.    Defendant prioritizes systems over students in other ways. Moving 6th Graders to middle school means children as young as 10 years of age are navigating multiple classes with multiple teachers as schools starts, rather than enjoying another year in a single nurturing classroom community with one teacher.

327.    This transition can be exponentially more difficult for boys who typically mature later. Add Autism to the mix, and you have a recipe for failure.

328.    Special Education Director (NE) testified about his own prior experience as a middle school counselor and administrator.

329.    For eight years he taught a class each day to foster student motivation, executive functioning, and work completion. He also co-taught nine (9) groups per week and

provided guidance curriculum and responsive services. (12-20-24 Tr. 199:21-24-200:1; 201:23-25).

330.      It was clear that he understood and practiced the type of supports that middle schoolers need to make a successful transition. Unfortunately, these strategies were not implemented at Student's middle school and they were not employed for Student.

331.      School Psychologist (AC) confirmed that parents commonly have concerns about 5th Graders transitioning to middle school. (12-16-24 Tr. 115:1-3). "Middle school is a different setting, so we can't anticipate needs that will arise at the middle school." (12-16-24 Tr. 115:4-14).

332.      Despite this, she still participated in taking Student off his IEP as he exited elementary school.

333.      Principal (N S-M) was a former middle school administrator who experienced frustration when students had been exited from Special Education at the end of elementary school, began to struggle in middle school, and then the qualification process for Special Education had to be initiated anew. (12-19-24 Tr. 335:14-23).

334.      Despite this first-hand knowledge, she still recommended Student be removed from his IEP at the end of 5th Grade without adequate consideration of "the child's anticipated needs," as required by 34 CFR §300.324(b)(i)(D).

335.      This systemic decision resulted in student immediately experiencing difficulty transitioning to and functioning within the more complex secondary school environment, worsening his inability to focus, emotional dysregulation, and deficits in executive functioning, concerns that trigged the Child Find requirement.

336.     IDEA requires that when developing an IEP, the team must consider information provided about the child by the parents. 34 CFR300.324(ba)(1)(ii)(c). Parents had spent all of the previous year struggling to get help for Student's basic accommodations and support, which only happened after they hired an attorney. This frustration and helplessness created prolonged stress and feelings of powerless. From Parents' perspective, District personnel acted in bad faith and actively resisted helping Student. (12-13-24 Tr. 304:6-9).

337.     For example, in his testimony School Psychologist (BS) alleged that Parents had prevented him from completing the FuBA by not returning permission to test (sent 1/30/24) in a timely fashion. When presented with evidence, however, the truth was Parents returned it the very next day (02/01/24), and (BS) collected FuBA data starting that same day. (DP Exh. P74, Bates 372). Parents had to prompt (BS) for a status update on 2/9/24 on the FuBA. (DP Exh. P74, Bates 372). Additionally, (BS) sent the FuBA questionnaire to Parents on 2/12/24, and Parents' responses were completed by 02/21/2024. (DP Exh. P75, Bates 372). (Tr. 299:20-302:25). Finally, School Psychologist (BS) went so far as to infer that Student did not really requalify for Special Education in May of 2024, because the team had merely bowed to parent demands. 12-19-24 Tr. 264:5-11. Strangely, he also claimed that Student's attendance had "caused" a learning disability in mathematics. (12-19-24 Tr. 263:20-24.)

338.     Before the start of the 2024-2025 academic year, the middle school invited Plaintiffs to an IEP team meeting. However, prior to Plaintiff's arrival at the 08/14/24 IEP meeting, Mrs. Aardema "advised that Mrs. Wilkes was not happy…"

339.     Although an agenda was emailed to Parents in advance, indicating that the meeting duration would be approximately 55 minutes. (Exh. P68.), Principal opened the meeting by announcing that teachers would be dismissed after only 30 minutes. (12-19-24 Tr. 174:20-175:25).

340.     Parent's frustration resulted from changed expectations and ongoing systemic failure, which she expressed as the meeting started. (Exh. R287). Principal (SK) persistently interrupted Parent to remind her teachers would be leaving soon.

341.     Student's accommodations were reviewed by the group and again by teachers who arrived late. Principal (SK) later solicited hurtful and harmful letters from teachers accusing Parent of misconduct and vulgarity, due to Parent (RW) using a single curse word as she voiced her frustration through an analogy. (12-19-24 Tr. 174:14-19).

342.     The letters included the following rude remarks: "After Ms. Wilkes's five-minute long speech on this topic…" "While it may seem like a small and simple thing to ask of [Student's] teachers, it does show Ms. Wilkes failure to see the big picture of what education is like in a middle and high school setting. Harrison is currently 1 of 32 students I will have in my class." "Parent's legal counsel…arrived late, unannounced, and uninvited." "It felt like she was trying to increase the scope or requirements of the accommodations." Almost all teachers reported taking offense when Parent asked them to take and wear and Autism awareness pin on their lanyard. (DP Exhs. R283-292).

343.     These letters do not define Parents' character, but reflect the bad faith, discrimination, and immense pressure Parents and Student have endured after begging for help for their son for more than 18 months.

344.     District's cumulative failures resulted in a denial of FAPE, an obligation under both IDEA and 504. 504's FAPE language overlaps with that of IDEA, explicitly stating that an "appropriate education" provides regular or Special Education, along with related services and aids designed to meet the individual educational needs of students with disabilities as adequately as the needs of students without disabilities. 34 CFR §104.33(b). When a FAPE is properly implemented, students with disabilities functionally demonstrate skill growth comparable to nondisabled peers. Per 34 CFR §300.1(a), IDEA ads a requirement for specialized instruction, a defining concept of Special Education. Specialized instruction helps students with disabilities acquire skills and knowledge tailored to individual needs, while ensuring access to education. The very purpose of Individuals with Disabilities Education Act (IDEA) is to prepare students with disabilities for **1) further education, 2) employment, and 3) independent living**.

345.     Student succeeded in elementary school under the safeguards of IDEA and the nurturing hand of his teachers, who accommodated his disability despite an inadequately written IEP. It is *common knowledge* that the transition from elementary to middle school challenges all students, more so for students with a disability. It was irresponsible and unjustifiable for District to systematically terminate Student's IEP as he made this transition. Witnesses RW and RS testified that their children also suffered from being exited from Special Education during this transition, both reporting they knew of other children who experienced the same predetermined and detrimental exit from Special Education during critical transitions in the same district. This is systemic, occurs to a greater degree than in comparable districts, and results in a denial of a Free and Appropriate Public Education (FAPE).

346.    In the same meeting in which the IEP was revoked, Defendants wrote a 504 plan for Student.  Unfortunately, Student's General Education Teacher was not in attendance, therefore, the accommodations which she had been providing during 5th Grade were not recording in his 504 plan which would go with him to middle school (6th Grade).

347.    In 6th Grade, Student had trouble focusing and completing work in the classroom.

348.    These challenges resulted in failing grades for Student.

349.    Plaintiff requested testing for possible special education eligibility.

350.    Plaintiff must show how the district's failure to provide a FAPE resulted in educational harm to the student.

351. Examples include of educational harm include:

   a.    Falling behind academically due to lack of appropriate services.

   b.    Emotional or psychological distress due to inappropriate placement.

   c.    Limited access to meaningful education or opportunities.

352.    Failing classes indicate he was not progressing at the rate of other students.

353.    Failing to progress in 6th grade creates additional burdens in subsequent grades.

354.    Failing classes subjected Student to shame from his inability to pass classes other students of his same age were passing.

355.    This shame damaged his sense of self-worth and capability.

356.    Each of these consequences resulted in a cumulative and severe impact on Student's educational opportunities.

357.    Defendants had the ability and responsibility to evaluate Student and return him to an IEP when he began to struggle and fail 6th Grade.

358.     If Defendant had been evaluated and services provided as the law requires, Student would have had the help and support he required as a person with a disability in need of specialized instruction.

359.     If the evaluation were conducted properly and it determined Student did not require an IEP, Plaintiffs would be on notice to continue their search for the source of the problem resulting in Students failing grades.

360.     IDEA contemplates protections for students not yet eligible under IDEA (34 CFR §300.534).

361.     IDEA places an affirmative duty on schools to identify, timely evaluate, and support students who have or are suspected of having disabilities and who may require Special Education services.

362.     Protections under the IDEA are triggered the moment a school knows, or should reasonably have known, that a student may have a disability. Suspicion of a disability "may be inferred from written parental concern, the behavior or performance of the child, teacher concern or a parental request for an evaluation." *Wiesenberg v. Bd of Educ. Of Salt Lake City Sch Dist.*, 181 F. Supp. 2d 1307, 1311 (D. Utah 2002).

363.     Here, Student continued to be eligible for Special Education during the entirety of his 6th Grade year due to having been removed from his IEP in 5th Grade without proper evaluation, procedure, team membership, or parental involvement.

364.     However, even if the Court determines the removal of Student's IEP was appropriate, District's obligations under IDEA were nevertheless ongoing, because a 504 Plan does not negate a school's obligation to evaluate for suspected disabilities that may

require specialized instruction. 34 CFR §300.534(b)(1)-(3) outlines criteria for determining a school's "prior knowledge" of a disability:

1. The parent of the child expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of Special Education and related services.

2. *Here, per parent request, meetings to change 504 Plan due to academic concerns were held on 10/9/23 (DP Exh. P62), 10/16/23 (DP Exh. P66), 1/8/24 DP Exh. P25). DP Exh. P76 is a 10/22/24 email from Assistant Principal (KA) to Special Education Director (NE) reviewing parental concerns received in the 2023-2024 school year on 12/11/23, 12/15/23, 1/30/24, 1/23/24, 1/26/24, and 3/1/24.*

3. The parent of the child requested an evaluation of the child pursuant to §§300.300 through 300.311.

4. *Here, Parents formally requested evaluations. Parents' 12/7/23 (DP Exh. P20) letter requested an evaluation. District claims parent recanted this request, yet they provided a Prior Written Notice refusing to evaluate (DP Exh. 21).* **OR**

5. The teacher of the child, or other personnel of the LEA, expressed specific concerns about a pattern of behavior demonstrated by the child directly to the director of Special Education of the agency or to other supervisory personnel of the agency.

6. *Here, teacher surveys and emails identified skill deficits identified during 6th Grade demonstrating a need for specialized instruction and a return to an IEP (DP Exh. P22-23). Examples include the following: social studies: F, 33.89%, off task, not doing work, struggles to turn in finished work, often doodling or just*

*generally off task; science: C, 76%, not retaking tests, (no accommodations being given); math: D, 64.78%, poor test scores; music: does not do any homework, does not turn anything in.*

365.    Defendants repeated failure or refusal is evident as all three elements of prior knowledge are met. Only one element is required to put District on notice. Therefore, Student was protected under IDEA for the entirety of the time covered by this Due Process Complaint.

366.    Plaintiffs should be entitled to have procedural and substantive violations of IDEA considered beyond a two-year calendar year deadline.

367.    34 CFR § 300.511(f) details exceptions to the two-year statute of limitations for filing a due process complaint, stating, "The timeline described in paragraph (e) of this section does not apply to a parent if the parent was prevented from filing a due process complaint due to (1) Specific misrepresentations by the LEA that it had resolved the problem forming the basis of the due process complaint; or (2) The LEA's withholding of information from the parent that was required under this part to be provided to the parent." The statute of limitations under IDEA serves as a filing deadline and does not inherently limit the scope of evidence that can be considered. In *G.L. v. Ligonier Valley School District Authority*, the 3rd Circuit clarified that claims must be filed within a two-year period, yet evidence occurring outside this period may be relevant and admissible to establish the context and pattern of the alleged violations.

368.    Additionally, the two-year limitation on filing due process complaints under the IDEA has been the subject of a circuit split in the United States courts of appeals. This limitation is specified in 20 U.S.C. § 1415(f)(3)(C), which states that a party must file a

due process complaint within two years of the date the alleged violation occurred. However, the application and interpretation of this limitation have varied across different circuits.

369.     Courts differ on whether the two-year period starts from the date of the alleged violation, the date the parent knew or should have known about the violation, or some other event.

370.     Some circuits (e.g., the 9th Circuit in *F.C. v. Capistrano Unified School District*, 2018) have held that the two-year period starts from the date the parent or the public agency knew or should have known about the violation. This view allows for the possibility of filing a complaint beyond the two years, particularly if the parent was unaware of the violation or had insufficient information to pursue a complaint earlier. Courts in these circuits have interpreted the statute to require a knowledge-based trigger for the limitation.

371.     Other circuits (e.g., the 4th Circuit in *A.D. v. Puyallup School District No. 3*, 2015) adhere to a stricter interpretation, stating that the two-year period begins to run from the date of the alleged violation itself, regardless of the parent's knowledge or awareness. This view holds that the limitation period should not be extended based on when the parent became aware of the violation, placing greater importance on the occurrence of the violation itself.

372.     In some cases, courts have applied a "continuing violation" theory, which holds that a violation continues if the discriminatory action or failure to provide appropriate services persists.

373.    Courts in circuits such as the 9th Circuit (in *F.C. v. Capistrano Unified School District*) have allowed claims to be filed even after the two-year period has elapsed, if the violation is ongoing. In such cases, the continuing violation theory extends the time limit, allowing parents to challenge ongoing violations as long as the alleged issue is unresolved.

374.    Other circuits have found that the continuing violation theory is not applicable to IDEA claims, meaning that the two-year period is fixed and does not extend for continuing violations.

375.    Courts have also considered whether equitable doctrines like equitable tolling might allow a parent to file a due process complaint beyond the two-year period. Equitable tolling is generally applied when a party is unable to meet a filing deadline due to extraordinary circumstances, such as being misled or prevented from filing by the other party.

376.    The 6th Circuit in *A.S. v. Norwalk Public Schools* (2017) ruled that equitable tolling could apply to IDEA due process complaints in certain cases, allowing the statute of limitations to be extended if the parent was prevented from filing due to circumstances beyond their control, such as misleading conduct by the school district.

377.    Other circuits have been more restrictive about applying equitable tolling to IDEA cases, arguing that the two-year limitation is designed to provide clarity and finality in the dispute resolution process.

378.    Here, Parents had a deep trust in the elementary school and staff.  Their son had made enormous early progress in the area of speech and language.  Talented teachers seemed able to adapt Student's environment and services to meet his need for specialized

instruction. Parents believed and trusted in the school to be maternal/paternal in their care for their son. Student is their only child.

379.     Here, District mislead Parents in stating that the General Education Teacher's input was not a critical element of an eligibility determination and excused the General Education Teacher from the IEP meeting in May 2023. DP Exh. P14.

380.     The General Education teacher's input provides the basis upon which the eligibility determination is made.

381.     She testified to providing multiple undocumented accommodations which, due to her absence, were not discussed at the IEP or 504 meetings.

382.     Plaintiffs are not expected to understand the implications of not having the General Education Teacher present to make recommendations on how Student's access to the general education curriculum would be ensured after exiting Special Education. Additionally, by withholding critical documents (such as speech records-presented for the first time in the hearing), Defendants effectively prevented the parents from identifying the basis for their complaint within the two-year timeline. Without this information, Parents couldn't evaluate whether Student received a FAPE or determine whether IDEA violations had occurred.

383.     Defendants' violations of Individuals with Disabilities Education Act (IDEA) resulted a denial of Free and Appropriate Public Education (FAPE) and damages to Plaintiffs.

384.     For each of these reasons, Plaintiffs seek to be made whole by Defendants for the educational harm cause by their IDEA violations.

## **THIRD CAUSE OF ACTION**
### Title V Section 504 of the Rehabilitation Act of 1973
### 29  U.S.C. § 794

385.     Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as

if fully set forth herein.

386.     Title V Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) protects

persons with disabilities and provides remedies, procedures, and rights to any person

alleging discrimination based on a disability.

387.     Section 504 creates a cause of action for any qualified individual who is

discriminated against based on their disability.

388.     Here, Student, a person, is a disabled/handicapped individual as determined by

Defendants determination of Student's disability in 2017 (IEP), 2023 (504), and 2024

(IDEA).

389.     Section 504 regulates any organization receiving financial assistance from any

federal department or agency.

390.     Here, Defendants receive federal financial assistance and are, therefore,

responsible for complying with 504.

391.     504 prohibits qualifying organizations from denying individuals with disabilities

an equal opportunity to receive program benefits and services.

392.     504 regulations require a school district provide a "free and appropriate public

education" (FAPE) to each qualified student with a disability who is in the school

district's jurisdiction, regardless of the nature or severity of the disability.

393.     Schools must provide equal access and accommodations and related services to

students with disabilities under Section 504.

394.    These services are intended to bridge the gap between a child with disabilities and mainstream students who are receiving a FAPE as a matter of course.

395.    Schools are forbidden by law from discriminating against those students by denying them necessary supports, akin to how IDEA mandates services through an IEP. 34 C.F.R. §104.44.

396.    Failing to provide a FAPE to disabled children while providing FAPE to mainstream children is discrimination.

397.    School Districts routinely claim they are not capable of providing additional services for a minority of disabled students at the expense of mainstream students.

398.    This line of thinking is precisely what laws and funding are intended to address.

399.    Consequently, School Districts must provide regular or special education and related aids and services designed to meet the student's individual educational needs as adequately as the needs of nondisabled students are met.

400.    An appropriate education for a student with a disability under Section 504 regulations could consist of education in regular classrooms, education in regular classes with supplementary services, and/or special education and related services.

401.    Here, Student was successful over many years of elementary school with the focused assistance of an elementary Speech/Language Teachers and General Education Teachers.

402.    The setting for 504 services matters.

403.    Defendant failed to identify and address the challenges faced by a child with Autism entering a much bigger middle school, with 7 classes and teachers, without a

cohort class of peers, requiring Student to organize and plan for assignments, and study for tests.

404.    The 504 plan as written was not designed and did not provide FAPE in the middle school setting.

405.    Parents' repeated requests for an aide (Student's repeated requests for a "Buddy") were the direct result of the failure of the 504 plan to address Student's needs.

406.    Section 504 has a broader definition of disability than the Individuals with Disabilities Education Act (IDEA). Student's disability affected his major life activities such as:

    a. Learning

    b. Concentrating

    c. Thinking

    d. Interacting with others

407.    Defendants discriminated against Student based on his disability by denying him the accommodations, modifications, and services to allow him to participate in educational programs and activities on an equal basis with students without disabilities. 34 C.F.R. § 104.44.

408.    Under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), Student must establish the following elements to prove defendants discriminated against him based on his disability:

    1. Student is a qualified person with a disability,

    2. Defendants are subject to Section 504,

3.  Student was excluded from participation in, denied benefits of, or subjected to discrimination under a program or activity, and

4.  The discrimination occurred sole by reason of the student's disability.

409.    Here, Student is a qualified person with a disability as he is diagnosed with autism, anxiety, and depression.

410.    His 504 Plan eligibility and later IEP determination under Other Health Impairment (OHI) confirm, Student was a person with a disability.

411.    Here, Defendant is subject to Section 504 as a recipient of federal funding.

412.    Student was excluded from participation in the general education setting by failing to provide modifications, accommodations, and services to meet his educational needs.  34 C.F.R. § 104.44.

413.    Public schools are required to provide a Free and Appropriate Public Education (FAPE) to each qualified handicapped person, regardless of the nature or severity of the person's handicap.

414.    Student must show he was otherwise qualified to receive an education and participate in school activities.

415.    His struggles stemmed from being a child with Autism without meaningful accommodations.

416.    Student must prove he was denied access to school programs because of his disability.

417.    Failure to provide behavioral accommodations for a student with a mental health condition violated Section 504. *D.L. v. District of Columbia*, 187 F. Supp. 3d 1 (D.D.C. 2016).

418.      Defendants discriminated against Student by failing to provide reasonable accommodations.

419.      Here, Student needed an aide as demonstrated by his request, parental requests, data from assessments and grades, and multiple diagnosis, but Defendants failed or refused to provide an aide or other meaningful accommodations to meet his needs.

420.      Under 34 C.F.R. § 104.33(a), schools must provide a Free Appropriate Public Education (FAPE) to students with disabilities.

421.      Section 504 plans require accommodations, such as allowing Student to use coping mechanisms and or providing mental health supports as opposed to punitive measures like requiring Student to drop P.E. to be minimally accommodated.

422.      As a result of Defendants failure or refusal to comply with the law, Plaintiff is damaged by loss of learning opportunities and resources specifically designed to facilitate success in the classroom, thereby fostering a greater sense of accomplishment, belonging, and value as a person.

423.      By shirking their responsibilities and discriminating against M.M., Defendants' actions have cost his family time and money to fight for their son, lost work opportunities, mental health, and a year of critical education that should be built upon in future years.

424.      If the court finds a section 504 violation, Student is entitled to compensatory, punitive damages, and remedies incorporated into 504 from the Civil Rights Act of 1964 by 20 USC §794(a).

425.      Student is entitled to damages as a result of these violations of his rights.

426.     Additionally, Plaintiff is entitled to an award of legal expenses (29 U.S.C. §

794a(b)) associated with bringing this action to force compliance.

**FOURTH CAUSE OF ACTION**
**Title II of the Americans with Disabilities Education Act of 1990 ("ADA")**
**42 U.S.C. § 12131-12134**

427.     Plaintiffs hereby realleges and incorporates by reference all preceding paragraphs

as if fully set forth herein.

428.     ADA (42 U.S.C. § 12131-12134), referred to as Title II of the American with

Disabilities Act, creates a cause of action for any qualified individual with a disability.

429.     Title II extends the antidiscrimination prohibition embodied in Section 504 to all

actions of state and local governments, and the standards adopted in Title II are generally

the same as those required under Section 504.  28 CFR § 35.103(a).

430.     The Americans with Disabilities Education Amendments Act (ADAA) was

signed into law in September 2008.

431.     Congress passed the ADAA in part to supersede the Supreme Court decisions that

had too narrowly interpreted the ADA's definition of a disability.

432.     As members of Congress explained, "The ADA Amendments Act rejects the high

burden required [by the Supreme Court] and reiterates that Congress intends that the

scope of the Americans with Disabilities Act be broad and inclusive.

433.     It is the intent of the legislation to establish a degree of functional limitation

required for an impairment to constitute a disability that is consistent with what Congress

originally intended."  154 Cong. Rec. S8342, S8345 (daily ed. Sept. 11, 2008) (statement

of the Managers).

434.    Just like 504, the ADA defines disability as (1) a physical or mental impairment that substantially limits a major life activity, (2) a record of such an impairment, or (3) being regarded as having such an impairment.  29 U.S.C. 705(9)(B), 42 U.S.C. § 12102(1).

435.    Here, Student was diagnosed with Autism in 2017 prior to his Kindergarten year in school.

436.    Since he is diagnosed as a student with Autism, Student is a qualified individual with a disability as defined by 42 U.S.C. § 12131(2), because he meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by Defendants and requires auxiliary aids and services as reasonable modifications to enable him to communicate, read, speak, and learn.

437.    Since he has a bona fide and recognized disability Defendants are required to provide accommodations to enable the possibility of his receipt of FAPE.

438.    ADA bars educational discrimination and requires educational institutions to make educational opportunities, extracurricular activities, and facilities open and accessible to all students regardless of whether they receive federal financial assistance.

439.    To allege a violation under the ADA, a plaintiff must demonstrate:

1. he is a qualified individual within the meaning of the Americans with Disabilities Education Act (ADA),

2. he was excluded from participation in, or was denied benefits of, services, programs, or activities for which the school district is responsible, and

3. such exclusion or discrimination is because of her disability.

440.     ADA defines a qualified individual as someone with a physical or mental

impairment that substantially limits one or more major life activities of such individual.

441.     Here, Student is a disabled person whose mental impairment (diagnosis of autism)

substantially limits

  1. Learning

  2. Concentrating

  3. Thinking

  4. Interacting with others

442.     He was assessed and qualified as a person with a disability by Defendants under

both Section 504 and the IDEA.

443.     In elementary school, when he was receiving accommodations, Student was able

to access the general education classroom and keep up with nondisabled students who

were not autistic or otherwise neurologically impaired.

444.     When Defendants failed or refused to recognize his diagnosis and subsequent

challenges, Student was denied the ability to thrive within the middle school setting.

445.     In middle school, Student was overwhelmed by unabated stimuli without any

meaningful opportunity for him to learn and keep his composure.

446.     Since his needs were not accommodated, he was not able to receive the benefit of

his education along with all of the neuro-typical children whom he attended school with.

447.      Defendants are responsible and required to offer these programs to all students

with and without disabilities without discrimination.

448.      Student was excluded because the expression of his disabilities was inaccurately

and unfairly considered to be laziness or typical transition struggles.

449.     As a result of Defendants failure or refusal to comply with the law, Plaintiff is damaged by loss of learning opportunities and resources specifically designed to facilitate success in the classroom, thereby fostering a greater sense of accomplishment, belonging, and value as a person.

450.     If the court finds Defendants violated the Americans with Disabilities Education Act (ADA), the court should grant general, special, punitive, intentional and negligent infliction of emotional distress, and reasonable attorneys' fees relief sought pursuant to 42 USC 12132.

## FIFTH CAUSE OF ACTION
### Utah State Constitution
### Article I, Section 1; Article 1, Section 7, Article X, Section 1

451.     Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

452.     The Utah State Constitution Article I, Section 1, Article I, Section 7, and Article X, Section 1 protects the rights of Utah citizens.

453.     Utah Constitution Article I, Section 1 (Inherent and Inalienable Rights) ensures that all persons have the interest and inalienable right to enjoy and defend their lives and liberties…and petition for redress of grievances.

454.     Article I, Section 7 (Due Process of Law) ensures that no person shall be deprived of life, liberty, or property without due process of law.

455.     Article X, Section 1 guarantees a free and equal public education to the children of Utah.

456.     This court should apply state law to the state constitutional claims, as the guarantees of life, liberty, redress, and due process issue from the Utah State Constitution, independent from the federal guarantees in the United States Constitution. *State v. Tiedemann*, 2007 UT 49, 183, 162 P.3d 1106.

457.     Although the state and federal constitutions have similar language, they should be analyzed as independent protections. *Batley v. Bayles*, 2002 UT 58, T11 n. 2, 52 P.3d 1158.

458.     The Utah Supreme Court has found Free and Equal Public Education Clause of the Utah Constitution (Article X, Section 1) and the Due Process Clause of the Utah Constitution (Article I, Section 7) are self-executing. *Spackman v. Bd of Educ.*, 2000 UT 87, 16 P.3d 533, 534.

459.     A self-executing constitutional clause is one that can be judicially enforced without implementing legislation. *Id*.

460.     In the *Spackman* case, the Utah Supreme Court applied common law to the state constitution claims to justify the right of "individuals to access remedies of money damages for violations of their individual rights." *Id*. at 538.

461.     Additionally, the Court determined that an appropriate remedy could also be fashioned by the court, even if no specific remedy is mentioned. *Id*.

462.     The court determined plaintiffs are entitled to monetary damages for a violation of the Utah Constitution if defendants:

1. committed a flagrant violation of plaintiff's constitutional rights,

2. existing remedies do not redress his injuries, and

   3.   equitable relief was and is inadequate to protect plaintiff's rights or redress his injuries. *Id*. at 538-539.

463.     Here, Defendants violated federal laws in numerous and diverse ways.

464.     First, they repeatedly failed or refused to provide Student with FAPE.

465.     Second, they refused to conduct meetings and appointments as procedurally required under the law.

466.     Third, they failed or refused to require the attendance of indispensable parties to meetings discussing plans and accommodations necessary to ensure Students right to FAPE is protected.

467.     Fourth, they failed to meaningfully involve Plaintiffs who were actively trying to be involved with the educational success and emotional stability of Student.

468.     If the court finds Defendants violated the Utah State Constitution, the court should grant monetary damages and any appropriate remedy fashioned by the court.

469.     As a result of Defendants failure and or refusal to follow federal and state laws, Plaintiff is damaged to the extent Students emotional stability is compromised, he is denied FAPE, and will require ongoing educational opportunities, counseling, therapy, and opportunities for success to overcome the significant damage caused by Defendants refusal and failure to provide FAPE.

## **RELIEF REQUESTED**

470.     Plaintiffs seek the following relief:

471.     Declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure that Defendants violated Student's rights under Civil Rights Act of 1871 ("CRA 1983") 42 U.S.C. 1983. See Fi Cause of Action.

472.     Declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure that Defendants violated Student's rights under Individuals with Disabilities Education Act (IDEA). See Second Cause of Action.

473.     Declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure that Defendants violated Student's rights under Section 504 of the Rehabilitation Act of 1974. See Third Cause of Action.

474.     Declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure that Defendants violated Student's rights under the Americans with Disabilities Education Act (ADA). See Fourth Cause of Action.

475.     Declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure that Defendants violated Student's rights under the Utah State Constitution Article I, Section 1, Article I, Section 7, and Article X, Section 1. See Fifth Cause of Action.

476.     As Plaintiffs do not believe the damage to Student's education and mental health can be repaired by typical enrollment in Defendants' schools or typical instruction by Defendants' teachers, they seek the following:

477.     General damages under ADA in amount not less than $1,000,000.00.

478.     Special damages under ADA in an amount not less than $500,000.00.

479.     Intentional Infliction of Emotional Distress Damages under ADA in an amount not less than $5,000,000.00.

480.    Negligent Infliction of Emotional Distress Damages under ADA in an amount not

less than $5,000,000.00.

481.    Punitive damages under §1983 and ADA in an amount not less than

$10,000,000.00.

482.    Money damages under the Utah State Constitution in an amount not less than

$1,000,000.00.

483.    As Plaintiffs have considerable damages, expenses, costs, and attorneys' fees,

they seek the following:

484.    Compensatory damages under §1983, 504, and ADA in an amount not less than

$500,000.00.

485.    Reasonable attorneys' fees under §1983, 504, ADA, & IDEA.

486.    As Plaintiffs have been damaged by defamatory and inflammatory writings

regarding Student's suspension and expulsion, they request the following:

487.    Injunctive relief under §1983 for Student's records to be expunged of all reference

to this incident, school safety assessments or investigations done following the incident,

discipline records of the incident, and all non-passing grades following the incident.

488.    Other relief for violation of federally protected rights at the Court's discretion as

authorized under *Bell v. Hood*, 327 U.S. 678, 684 (1946).


DATED this 20th day of March 2025.


*/s/ Amy L. Martz*    */s/ Tyler Ayres*
Amy L. Martz    Tyler Ayres
*Attorneys for Plaintiffs*